AO 106 (Rev. 04/10) Application for a Search Warrant (Modified: WAWD 10-26-18)

# UNITED STATES DISTRICT COURT
### for the
### Western District of Washington

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

Information associated with Instagram account @frank_e_fresh_206, as described in Attachment A

Case No.    MJ23-058

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, incorporated herein by reference

located in the _____ Northern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841, 846, 843(b) | Possession with Intent to Distribute Controlled Substances, Conspiracy, Use of Comm. Facility |

The application is based on these facts:

✓  See Affidavit of Matt Blackburn, continued on the attached sheet.

☑  Delayed notice of   90   days (give exact ending date if more than 30 days:   05/09/2023   is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented: ☑ by reliable electronic means; or: ☐ telephonically recorded.

*Applicant's signature*

Matt Blackburn, Task Force Officer, FBI
*Printed name and title*

○ The foregoing affidavit was sworn to before me and signed in my presence, or
⊙ The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date:   02/08/2023

*Judge's signature*

City and state:  Seattle, Washington

Brian A. Tsuchida, United States Magistrate Judge
*Printed name and title*

USAO #2022R01268

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR**

**SEARCH WARRANT**

STATE OF WASHINGTON          )
                             )          ss
COUNTY OF KING               )

I, Matt Blackburn, being first duly sworn, depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain Instagram account that is stored at premises maintained, controlled, or operated by Meta Platforms, Inc. ("Meta"), an electronic communications service and/or remote computing service provider headquartered at 1601 Willow Road in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Meta to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2.      I am a Task Force Officer (TFO) with the Federal Bureau of Investigations (FBI) and have been since June of 2022.  I am a duly sworn member of the Seattle Police Department (SPD) and have been employed as a police officer since December of 2007. I am currently assigned to the SPD Gun Violence Reduction Unit (GVRU).  In May of 2022, I was assigned as a TFO with the FBI. I am currently assigned to the violent crime, gang, and transnational organized crime squad in the Seattle, Washington Division of the

FBI. I have approximately fourteen years of state law enforcement experience. I completed the Washington State Criminal Justice Commissions Basic Law Enforcement academy as well as the SPD Anti-Crime Team School and Undercover School.  I have also been trained and have experience in the handling and use of confidential informants. As an SPD officer, I have actively participated in investigations of criminal activity, including but not limited to: crimes against persons, crimes against property, fire and explosives-related crimes, and crimes involving the possession, use, and theft of firearms. I have also been a part of hundreds of narcotic investigations ranging from the street-level sale and consumption of drugs to international drug trafficking organizations.  I have been trained in the identification of illegal narcotics, their use, and how they are consumed and distributed.  As part of some of these investigations, I have developed and utilized confidential informants.  During these investigations, I have also participated in the execution of search warrants and the seizure of evidence indicating the presence of criminal violations. As a law enforcement officer, I have testified under oath, affirmed to applications of search and arrest warrants, and obtained electronic monitoring orders.

3.      In my role as a police officer and a member of the FBI Safe Streets Task Force, I have participated in gang investigations that have resulted in the arrest of individuals and the seizure of illicit narcotics and/or narcotics-related evidence, firearms, and the forfeiture of narcotics-related assets. I have been involved in the service of federal and state search warrants as part of these investigations. I am also familiar with the manner in which criminals, including gang members/associates, use telephones, often cellular telephones, to conduct their unlawful operations, and how they code their conversations to disguise their unlawful activities.

4.      I have drafted search warrants, tracking warrants, and other legal process in furtherance of investigations. I have executed search warrants for items such as controlled substances in residences and vehicles. I have used technology to include Global Positioning Systems (GPS) and cameras to monitor and locate subjects of criminal

Affidavit of Task Force Officer Matt Blackburn - 2
USAO #2022R01268

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

investigations. I have also conducted physical surveillance of persons, places, and things in furtherance of criminal investigations.

5.      The facts set forth in this Affidavit are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers; review of documents and records related to this investigation; communications with others who have personal knowledge of the events and circumstances described herein; and information gained through my training and experience.  Because this Affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact that I or others have learned during the course of this investigation.

6.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of the Controlled Substances Act, Title 21, United States Code, Section 801 *et seq.*, have been committed by Frank L. Graves.  There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, and/or fruits of these crimes further described in Attachment B.

## JURISDICTION

7.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## THE INVESTIGATION

8.      The United States, including the FBI and the SPD, is conducting a criminal investigation of a regional drug trafficking organization, which investigators are referring to as the Graves DTO. The Graves DTO is believed to transport narcotics, including fentanyl-laced pills, from the Las Vegas area to the Seattle area for redistribution. The

Affidavit of Task Force Officer Matt Blackburn - 3
USAO #2022R01268

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

targets of this investigation include Frank L. Graves (referred to as "Frank Graves"); his son, Frank M. Graves (referred to in this affidavit as "Frank Jr."); and Lionel Hampton. Investigators believe that Frank Graves is distributing fentanyl-laced pills within the Western District of Washington.

9.       In February of 2015, Frank Graves was arrested by the Kent Police Department for the sale of Oxycodone pills.  At the time of Frank Graves' arrest, police seized 391 pills from his person, 100 from his vehicle, 259 from his wife's vehicle, and 261 from his residence at 1175 Harrington PL NE, #201, in Renton, Washington.  Graves was charged in King County Superior Court and pled guilty to one count of conspiracy to possess with the intent to deliver Oxycodone and one count of unlawful possession of Oxycodone.  He was sentenced to 30 days in jail on a work release program and one year under the Washington State Department of Corrections supervision.   He is not currently under supervision by any state or federal correction agency.

10.       In July of 2019, Frank M. Graves ("Frank Jr.") was involved in a drug transaction where he sold fentanyl pills to two individuals who attempted to rob him. Frank Jr. shot both, killing one, and was shot himself in return.  At the time of the shooting, he had over $11,000 in cash and 500 Oxycodone pills, packaged in groups of 100.  Frank Jr. was charged with Unlawful Possession of a Firearm and Possession of Narcotics with the intent to Deliver.  He plead guilty to Unlawful Possession of Firearms in the Second Degree and received a sentence of 33 months.  He is currently serving his sentence in the Olympic Corrections Center – a state prison run by the Washington State Department of Corrections ("DOC").

11.       Throughout the course of this investigation, since September of 2022, investigators have been following and reviewing publicly available content shared by the Instagram account @frank_e_fresh_206 ("**Target Account 1**").  **Target Account 1** is believed to be used by Frank Graves because selfie-style photos and videos shared by the account depict Frank Graves, identified by a comparison to his photograph on file with

the Washington Department of Licensing (DOL).  Throughout the investigation, the

account has been active, often sharing photographs and videos multiple times a day.

Much of the publicly available content consists of selfie-style videos featuring Frank

Graves speaking into the camera, including videos in which Frank Graves appears to be

discussing drug trafficking and advertising his drug trafficking business, in part by

showing off a lifestyle that investigators believe is supported by proceeds of his illegal

activity.

**A.    Evidence of Frank Graves's Drug Trafficking**

       *1.    Frank Graves Discusses Drug Trafficking on Recorded Prison Calls*

       12.    At the beginning of July 2022, Frank Jr. self-surrendered to begin serving

his sentence in the conviction described above.  During his time in state custody, Frank

Jr. has made several calls to his father, Frank Graves, at the phone number (206) 602-

8343 (TT1).[1]  When calling his father, Frank Jr. used the phone systems at county jails

and state prisons, which were recorded.  Through the course of the recorded calls to

Frank Graves using TT1, Frank Graves used coded language to discuss the fact that he

had taken over Frank Jr.'s drug business while Frank Jr. was incarcerated and the

challenges that Frank Graves was facing running that business.  For example, on October

16, 2022 at 8:28 a.m., Frank Jr. called TT1 and spoke with Frank Graves from Coyote

Ridge Correction Center on a recorded line.  During the conversation, the following

exchange took place:

---

[1] Based on my review of recorded jail calls and social media accounts for Frank Graves, I am familiar with and recognize his voice as the person who always answers TT1 in Frank Jr.'s calls.  Based on my review of jail calls, I further know that Frank Jr. as the person who places the calls described below, because the majority of the calls are associated with him in the respective correctional call systems, and Frank Graves often greets the person calling from the jail as "Frank."  Moreover, inmates of the King County Jail and DOC facilities use individual identification, a PIN system, which links every call made to that specific inmate, though it is possible for an inmate to use another inmate's PIN.  Based on my training and experience, I know that users of the phone systems at the King County Jail and Washington DOC facilities, including both the incarcerated individuals and the people they call, are warned that the line is recorded prior to each call being connected.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

Frank Graves (TT1): Carlos, Little Carlos says what's up.

Frank Jr.: My Mexican dude?

Frank Graves (TT1): Yeah, he says he doesn't do candy, man, he was trying to explain to me his buddy does the candy. He doesn't do it or some shit he was telling me. He's like No I don't do it man I don't know how to do it.

Frank Jr.: Are you trying to sell your Cutlass? How much you trying to sell your Cutlass for?

13. Based on my training and experience, I know that "candy" is a common slang term used to refer to fentanyl pills. I believe that Frank Graves was commenting on a drug supplier familiar to Frank Jr., telling Frank Jr. that this person, "Carlos," was no longer supplying fentanyl pills. I further believe that Frank Jr., knowing that the call was being recorded, immediately changed the subject to one of Frank Graves's vehicles.

14. In addition, while talking to Frank Jr. on the recorded line, Frank Graves could be overheard on some of the recorded calls completing drug transactions with others. For example, in a call from Frank Jr. to TT1 on July 7, 2022, Frank Graves can be overheard completing a drug transaction with an unknown female. On the recorded call, the unknown female asks Frank Graves if he has "any other ones on you," and Frank Graves asks Frank Jr. to hold on. The following discussion can then be heard on the recording:

Frank Graves (TT1): I just have the, um, I don't know what happened … I always do … I don't know, I'm sorry ... I don't have them on me. You don't like these, right?

Female: [unintelligible]

Frank Graves (TT1): They are [unintelligible]

Female: [unintelligible]

Frank Graves (TT1): Man I'm sorry, here. I don't know what happened.

Female: Ok [unintelligible]. Let me take two of those then.

Frank Graves (TT1): 30. I'm sorry about that.

Female: Ok. That's fine. Just hit me later.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

15.     Based on my training and experience, I believe that Frank Graves is speaking to and conducting a drug transaction with an unknown female who is in the room with him.  When he says that he doesn't "know what happened" and "doesn't have them on me," I believe that Frank Graves is apologizing for not having a particular drug that the female wants.  The female then says that she will take "two of those" instead, indicating that she will purchase a drug that Frank Graves does have with him.  When Frank Graves immediately responds with "30," I believe that he is referring to the price for that quantity of the unknown drug he is providing to the female.

### 2.     *Financial Records Show Deposits That Are Indicative of Illegal Activity*

16.     Investigators conducted a database check and obtained employment information from the Employment Security Department of Washington State for Frank L Graves, which showed no earned wages or income from January 1, 2019 through March 31, 2022.   Nevertheless, financial records show that, between January 1, 2022 and October 7, 2022, a bank account at Bank of America in Frank Graves's name received over $195,000 in cash deposits and over $170,000 from peer to peer applications, such as Zelle and Cash App.  Based on my training and experience, these large deposits in cash and peer-to-peer transactions, which have not been reported as income, indicate that Frank Graves is likely earning money through illegal activity.

17.     Moreover, based on my training and experience, I know that drug traffickers who have engaged in the trade for extended periods of time, as investigators suspect Frank Graves has, are unlikely to stop, particularly when they have achieved an elevated standard of living and prestige that are unavailable in other, legitimate business ventures.

### 3.     *Suspected Hand-to-Hand Drug Transactions*

18.     Investigators have conducted physical surveillance of Frank Graves and have observed him conduct suspected hand-to-hand drug transactions.  Based on their observations, investigators believe that Frank Graves typically conducts his drug

Affidavit of Task Force Officer Matt Blackburn - 7
USAO #2022R01268

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

transactions in public parking lots, which he gets to either by walking from his residence at 1175 Harrington PL NE in Renton or by driving one of several vehicles registered to him.  Investigators have observed Frank Graves conduct suspected drug deals with several different individuals, with the meetings lasting for short periods of time. Investigators have observed Frank Graves driving multiple vehicles in the time that they have been conducting physical surveillance of him, and he has 6 vehicles registered in his name at the 1175 Harrington PL NE address in Renton.  Investigators believe that Frank Graves regularly switches out the vehicles that he uses to conduct his drug trafficking, a tactic commonly used by drug traffickers in an effort to avoid detection by law enforcement or rival drug traffickers.

19.     For example, on the evening of November 9, 2022, investigators conducted physical surveillance in the parking lot of the Rite Aid located at 3116 Sunset Blvd NE in Renton, Washington, near Frank Graves' residence at 1175 Harrington PL NE.[2]  At approximately 8:10 p.m., investigators saw a white Dodge Ram pickup enter the lot and park one parking spot away.  The vehicle appeared to have only one occupant, and it backed into the parking spot and turned out its lights.  Nobody exited the vehicle, which is unusual in a commercial parking lot.  In my training and experience, drug traffickers will often park in this manner in an effort to appear as a parked car while being able to view any movements by law enforcement and escape rapidly.  At 8:19 p.m., investigators saw a light-skinned black male walk up to the driver's side window of the white Dodge Ram.  This male was wearing a black puffy coat, a pink hoodie underneath with the hood pulled up and blue jeans with something embroidered on them.  Based on the person's physical characteristics, including his height and weight, and clothing, which matched clothing investigators had seen in a video shared by **Target Account 1** earlier in the day (see below), investigators believed that this person was Frank Graves.  Investigators saw

---

[2] Investigators chose this location after Frank Graves mentioned a Rite Aid as a place where he conducts drug transactions in an October 14, 2022 recorded call with Frank Jr.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

the man hand something through the driver's side window to the occupant of the white truck, and the driver handed something back.  The white truck then pulled out and left the parking lot while the man who arrived on foot walked away westbound on NE 12th Street towards Harrington PL NE, where Frank Graves' condo is located.  Investigators used their vehicle to follow and then drive next to the man who had arrived on foot, who was looking at a cell phone and had his face illuminated by the screen.  At that point, investigators recognized that person as Frank Graves, based on comparison to his Washington State Department of Licensing photo.  Based on my training and experience, this short interaction in the parking lot, in which the two individuals met briefly and exchanged something by hand, is consistent with a hand-to-hand drug transaction.

20.     On November 30, 2022 at 11:59 a.m., GPS data for TT1, obtained pursuant to Court authorization, placed the device within range of the Safeway located at 3820 Rainier Avenue South, in Seattle.  Investigators arrived in the area to conduct surveillance at approximately 12:00 p.m., locating a light blue 2015 Chevrolet Suburban bearing Washington state license plate number CDL3026 parked directly outside of Mod Pizza in the Safeway shopping center.  A records check revealed the vehicle is registered to Frank Lozano Graves at 1175 Harrington Place Northeast, #201, in Renton, and investigators had seen Frank Graves drive the vehicle on previous occasions.  At approximately 12:23 p.m., investigators observed a black full-size pickup pull up and park next to the passenger side of the Suburban.  A black male with a green hooded sweatshirt with the hood up got out of the driver's seat and got into the front passenger seat of the Suburban.  Less than a minute later, the male got back out of the Suburban and into the pickup.  The pickup then drove out of the area.

21.     At approximately 12:32 p.m., another unknown black male appearing to be in his late 30s and wearing a black sweatsuit walked up to the driver's door of the Suburban.  Investigators then observed Frank Graves, identified based on a comparison to his DOL photograph, exit the driver's side of the Suburban. Frank Graves and the

unknown male then went to the trunk of the Suburban and appeared to look at something in the trunk.  Frank Graves reached into the baggage area and pulled an item out, holding it close to his body, in one hand.  Investigators conducting physical surveillance could not see what that item was and believed, based on training and experience, that Frank Graves was attempting to conceal the nature of that package.  Frank Graves quickly closed the trunk and got back into the driver's seat, while the unknown male got into the front passenger seat.  Approximately two minutes later, the unknown male got out of the Suburban and walked away southbound in the parking lot.  Frank Graves then drove out of the area in the Suburban. Based on my training and experience, the location of the meetings between Frank Graves and the unknown males in a public parking lot, the short duration of these meetings, prior physical surveillance of Frank Graves conducting suspected drug transactions in public parking lots, and the recorded phone calls discussed above, I believe that Frank Graves was conducting drug transactions with these unknown males in the Suburban.

**B.      Frank Graves' Use of Target Account 1**

22.      Frank Graves regularly uses **Target Account 1**, which has posted videos and photos almost daily during the course of this investigation.  These videos and photos most often detail and demonstrate Frank Graves' outfit of the day (investigators have not seen him wear the same set of clothing twice), his many vehicles, or his largesse – giving away clothing, shoes, items, or money.  While Frank Graves alludes to his drug trafficking business in some of these videos (detailed below), the majority of the content shared by **Target Account 1** shows portions of his daily life, his affluence (multiple cars, expensive clothing), and his largesse to others.  Based on my training and experience, I believe that these videos and photographs act as an advertisement for Frank Graves' drug trafficking business and his lifestyle funded by the proceeds of his illegal activity.

23.      For example, on November 9, 2022 at approximately 3:00 p.m., **Target Account 1** posted a video in which Frank Graves can be seen wearing a pink hoodie

Affidavit of Task Force Officer Matt Blackburn - 10
USAO #2022R01268

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

sweatshirt beneath a black, puffy coat, and blue jeans with stars embroidered on them (the same outfit investigators observed him wearing when he conducted a suspected drug transaction later that day, as described above). In the video, Frank Graves spoke the following to the camera:

> Frank Graves: If you want a thrill in your life, put a pill in your life.
>
> [As he said this, he mimicked flipping something into his mouth.]
>
> Frank Graves: For rig-a-deal fo shig-a-dil. Fresh Fresh man. I mean. Out here doing the [unintelligible] man. It aint gonna stop. Every since I was a youngster man, I've been doing this shit man. Running. Fast man. Doing my thing thing. You know what I mean. Elvis mother-fucking-freshly man.

24.     Based on my training and experience, I believe that Frank Graves is advertising his drug trafficking business in this video. First, he encourages people to take pills – likely fentanyl pills. Based on my training and experience, I believe that individuals looking for pills would understand from this video that they could contact Frank Graves for them. He then brags that he has been doing his "thing thing" from a young age. Based on the fact that Frank Graves has no known legitimate income from 2019 to early 2022, I believe he is stating that he has been dealing drugs since he was young.

25.     On December 1, 2022, at approximately 10:00 a.m., **Target Account 1** shared a publicly viewable video in which Frank Graves can be seen wearing an orange hoodie sweatshirt beneath a white and black letterman's style jacket and an orange beanie. Frank Graves then spoke the following to the camera:

> Frank Graves: Man, about my paper [money] man. You guys, about your money, they be like 'it's snowing, it's this, it's that.' Hey, I'll wouldn't give a damn if it was snow, ah, nails man. I'm getting out and getting my money, man. If I'm in a wheelchair, I'm gonna be rolling to the block. Man, you know what I'm saying. I wouldn't give a fuck. Aint nothing gonna stop me from getting some money, man. Believe that, man. Elvis Freshly, man. I'm a hustler's hustler, man. Franke Yadeda Hollar. I mean. Shit you can't do nothing without the money, you know what I mean. So don't let shit stop you from getting some mother-fucking paper [money], man. At

Affidavit of Task Force Officer Matt Blackburn - 11
USAO #2022R01268

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

all costs, man, get your money, man.  You know.  Be a duffle-bag boy.  I mean.  You know.  Yeah.  But anyway.  I just be.  A little motivation for this morning.  Man, don't let shit stop you.  I don't give a fuck if it was a blizzard, man.  I'm getting out the fuck here and getting some of my mother fucking –

26.     At this point in the video, it cuts off.  Based on my training and experience, I believe that Frank Graves is discussing his drug trafficking business in this video.  I know that that, on December 1, 2022, there was a significant snowstorm in the Seattle area.  In the video, Frank Graves is saying that he would not let the snow get in the way of making "paper," a common slang term for money.  Based on my training and experience, I believe that individuals looking for drugs would understand from this video that Frank Graves remained open for business during the snowstorm, while other drug suppliers may not.  Frank Graves also says that he is a "hustler's hustler," with "hustler" being a term commonly used to refer to a drug dealer.

27.     On December 7, 2022, at approximately 12:00 p.m., **Target Account 1** shared a publicly viewable video in which Frank Graves can be seen wearing a yellow hoodie sweatshirt beneath a yellow jacket and yellow-accented running shoes.  Frank Graves then spoke the following to the camera:

Frank Graves:   I just took a pause in my little daily routine, man.  Out here doing my "thing thing," man.  You know.  Out here in Columbia City, man.  What's you guys know about Columbia City, man.  When I used to do my thing back in the day, man.  Caught a couple cases in Columbia City.  [Laughs] Trying to blow the area up.  Man.  But they done kinda gentrified it now.  Aint to more.  Aint too many more n***as over here. There is a couple but it aint, you know, everything is turning gentrified or whatever.  But yeah man.  I used to blow this area up, man.  It was my old stomping grounds, man.  But, you grow, you get older, you get wiser, man.  Fresh Fresh baby.  I mean.  Man.  Get, get the cheddar [money], man.  Yeah.

28.     In this video, I believe that Graves is referencing his narcotics career in the Columbia City neighborhood as a youth and comparing to that same career now.  Based on my training and experience, I know that Columbia City is a neighborhood in the south

end of Seattle along Rainer Ave, roughly between Martin Luther King JR WY S to the north and S Graham ST to the south.  I also know that "caught a couple cases" is a reference to having been arrested, though investigators have not been able to find records of arrests for Frank Graves as a young man in Columbia City.  In this video, Frank Graves repeats the use of the phrase "thing thing" when referring to his drug trafficking business.

29.     On December 23, 2022, investigators received Court authorization to install and use a pen register/trap and trace device on **Target Account 1**.  Almost every day since, **Target Account 1** has sent and received direct messages from other Instagram users.  Investigators have been able to identify the possible users of some of the accounts that have been in contact with **Target Account 1** as family members of Frank Graves' suspected co-conspirators and known Seattle area gang members who have been involved in drug trafficking in the past.  For example, **Target Account 1** has exchanged direct messages with @lj_hampton, believed to be used by Lionel Hampton Jr., the son of Frank Graves' suspected co-conspirator Lionel Hampton.  In addition, **Target Account 1** exchanged direct messages with @thomascallandret, believed to be used by Thomas Callendret, the brother of suspected co-conspirator Cornell Callandret.  **Target Account 1** has also sent or received messages with the account @206debonair on December 26 and 27, 2022, and January 29 and 30, 2023.  The account @206debonair identifies its user as Devvenorre Dallas, and the publicly viewable content for the account included several photos of a black male with a short hair, approximately 30 years old.  Investigators compared these photos with the DOL photo for Devvenore D Dallas and confirmed that they are the same person.  Investigators believe that Devvenore Dallas was involved in drug trafficking in the Seattle area until at least 2021, when he was convicted for unlawful possession of a firearm and possession of a controlled substance.  Moreover, records from law enforcement databases show that, in September of 2019, Devvenore Dallas was contacted by Port of Seattle police after flying from

Affidavit of Task Force Officer Matt Blackburn - 13
USAO #2022R01268

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

Atlanta to Seattle.  A drug detection dog alerted to his luggage and officers found over $3,000 dollars in cash with traces of narcotics residue on them, which officers seized after Devvenore Dallas claimed not to know how it got in his luggage.  I know, based on my training and experience, that drug traffickers often conduct their business in cash and will travel with large quantities of U.S. currency, including on flights.  During that stop, officers photographed Devvenore Dallas, and investigators have confirmed that the person in those photographs is also the person pictured in the Instagram account @206deboinair.

30.     Pen register/trap and trace information also shows that **Target Account 1** exchanges direct messages with several other accounts on a regular basis each week, leading investigators to believe that some of these accounts could be drug redistributors or customers.  While regular innocent communication between acquaintances or friends occurs on Instagram, I also know, based on my training and experience, that individuals engaged in the redistribution or use of controlled substances need to be regularly supplied, and will often return to the same trusted supplier.  I therefore believe that some of these communications will contain information about Frank Graves' drug trafficking activity.

31.     On October 27, 2022, investigators submitted a preservation request to Meta, requesting that information relating to **Target Account 1** be preserved through April 20, 2023.

32.     Based on the foregoing, I respectfully submit there is probable cause to believe that that Frank Graves is using his Instagram account in furtherance of drug trafficking, including violations of Title 21 of the United States Code.  While the majority of the publicly viewable content on **Target Account 1** consists of selfie-style videos and images of friends, Frank Graves often records himself in the middle of the day, when investigators believe he is doing his "thing thing," or making drug deliveries.  In the videos detailed above, Graves discusses his drug trafficking business using coded

Affidavit of Task Force Officer Matt Blackburn - 14
USAO #2022R01268

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

language.  As such, those videos act as advertising for his drug trafficking business.  I believe this entire account, where Frank Graves shows off the lifestyle made possible by his drug trafficking, acts as further advertising for that business. Based on the identities of the users of some of the accounts with which **Target Account 1** exchanges messages, the regularity of some of the messaging between accounts, and the fact that **Target Account 1** appears to be used as advertising for Frank Graves' drug trafficking business, I believe that communications relating to drug trafficking or money laundering will be found in those messages.

## BACKGROUND REGARDING INSTAGRAM'S SERVICES[3]

33.     Instagram is a service owned by Meta, a United States company and a provider of an electronic communications service as defined by 18 U.S.C. §§ 3127(1) and 2510.  Specifically, Instagram is a free-access social networking service, accessible through its website and its mobile application, that allows subscribers to acquire and use Instagram accounts, like the target account(s) listed in Attachment A, through which users can share messages, multimedia, and other information with other Instagram users and the general public.

34.     Meta collects basic contact and personal identifying information from users during the Instagram registration process.  This information, which can later be changed by the user, may include the user's full name, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, credit card or bank account number, and other personal identifiers.  Meta keeps records of changes made to this information.

35.     Meta also collects and retains information about how each user accesses and uses Instagram.  This includes information about the Internet Protocol ("IP")

---

[3] The information in this section is based on information published by Meta on its Instagram website, including, but not limited to, the following webpages: "Privacy Policy," https://privacycenter.instagram.com/policy/; "Information for Law Enforcement," https://help.instagram.com/494561080557017; and "Help Center," https://help.instagram.com.

Affidavit of Task Force Officer Matt Blackburn - 15
USAO #2022R01268

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

addresses used to create and use an account, unique identifiers and other information about devices and web browsers used to access an account, and session times and durations.

36.     Each Instagram account is identified by a unique username chosen by the user.  Users can change their usernames whenever they choose but no two users can have the same usernames at the same time.  Instagram users can create multiple accounts and, if "added" to the primary account, can switch between the associated accounts on a device without having to repeatedly log-in and log-out.

37.     Instagram users can also connect their Instagram and Facebook accounts to utilize certain cross-platform features, and multiple Instagram accounts can be connected to a single Facebook account.  Instagram accounts can also be connected to certain third-party websites and mobile apps for similar functionality.  For example, an Instagram user can "tweet" an image uploaded to Instagram to a connected Twitter account or post it to a connected Facebook account, or transfer an image from Instagram to a connected image printing service.  Meta maintains records of changed Instagram usernames, associated Instagram accounts, and previous and current connections with accounts on Meta and third-party websites and mobile apps.

38.     Instagram users can "follow" other users to receive updates about their posts and to gain access that might otherwise be restricted by privacy settings (for example, users can choose whether their posts are visible to anyone or only to their followers).  Users can also "block" other users from viewing their posts and searching for their account, "mute" users to avoid seeing their posts, and "restrict" users to hide certain activity and prescreen their comments.  Instagram also allows users to create a "close friends list" for targeting certain communications and activities to a subset of followers.

39.     Users have several ways to search for friends and associates to follow on Instagram, such as by allowing Meta to access the contact lists on their devices to identify which contacts are Instagram users.  Meta retains this contact data unless deleted by the user and periodically syncs with the user's devices to capture changes and additions.

Affidavit of Task Force Officer Matt Blackburn - 16
USAO #2022R01268

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

Users can similarly allow Meta to search an associated Facebook account for friends who are also Instagram users.  Users can also manually search for friends or associates.

40.     Each Instagram user has a profile page where certain content they create and share ("posts") can be viewed either by the general public or only the user's followers, depending on privacy settings.  Users can customize their profile by adding their name, a photo, a short biography ("Bio"), and a website address.

41.     One of Instagram's primary features is the ability to create, edit, share, and interact with photos and short videos.  Users can upload photos or videos taken with or stored on their devices, to which they can apply filters and other visual effects, add a caption, enter the usernames of other users ("tag"), or add a location.  These appear as posts on the user's profile.  Users can remove posts from their profiles by deleting or archiving them.  Archived posts can be reposted because, unlike deleted posts, they remain on Meta's servers.

42.     Users can interact with posts by liking them, adding or replying to comments, or sharing them within or outside of Instagram.  Users receive notification when they are tagged in a post by its creator or mentioned in a comment (users can "mention" others by adding their username to a comment followed by "@").  An Instagram post created by one user may appear on the profiles or feeds of other users depending on a number of factors, including privacy settings and which users were tagged or mentioned.

43.     An Instagram "story" is similar to a post but can be viewed by other users for only 24 hours.  Stories are automatically saved to the creator's "Stories Archive" and remain on Meta's servers unless manually deleted.  The usernames of those who viewed a story are visible to the story's creator until 48 hours after the story was posted.

44.     Instagram allows users to broadcast live video from their profiles.  Viewers can like and add comments to the video while it is live, but the video and any user interactions are removed from Instagram upon completion unless the creator chooses to send the video to IGTV, Instagram's long-form video app.

Affidavit of Task Force Officer Matt Blackburn - 17
USAO #2022R01268

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

45.     Instagram Direct, Instagram's messaging service, allows users to send private messages to select individuals or groups. These messages may include text, photos, videos, posts, videos, profiles, and other information. Participants to a group conversation can name the group and send invitations to others to join. Instagram users can send individual or group messages with "disappearing" photos or videos that can only be viewed by recipients once or twice, depending on settings. Senders can't view their disappearing messages after they are sent but do have access to each message's status, which indicates whether it was delivered, opened, or replayed, and if the recipient took a screenshot. Instagram Direct also enables users to video chat with each other directly or in groups.

46.     Instagram offers services such as Instagram Checkout and Facebook Pay for users to make purchases, donate money, and conduct other financial transactions within the Instagram platform as well as on Facebook and other associated websites and apps. Instagram collects and retains payment information, billing records, and transactional and other information when these services are utilized.

47.     Instagram has a search function which allows users to search for accounts by username, user activity by location, and user activity by hashtag. Hashtags, which are topical words or phrases preceded by a hash sign (#), can be added to posts to make them more easily searchable and can be "followed" to generate related updates from Instagram. Meta retains records of a user's search history and followed hashtags.

48.     Meta collects and retains location information relating to the use of an Instagram account, including user-entered location tags and location information used by Meta to personalize and target advertisements.

49.     Meta uses information it gathers from its platforms and other sources about the demographics, interests, actions, and connections of its users to select and personalize ads, offers, and other sponsored content. Meta maintains related records for Instagram users, including information about their perceived ad topic preferences, interactions with ads, and advertising identifiers. This data can provide insights into a user's identity and activities, and it can also reveal potential sources of additional evidence.

Affidavit of Task Force Officer Matt Blackburn - 18
USAO #2022R01268

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

50.     In some cases, Instagram users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

51.     For each Instagram user, Meta collects and retains the content and other records described above, sometimes even after it is changed by the user (including usernames, phone numbers, email addresses, full names, privacy settings, email addresses, and profile bios and links).

52.     In my training and experience, evidence of who was using Instagram and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above.  This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, specifically drug trafficking and the identification of customers, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

53.     For example, the stored communications and files connected to an Instagram account may provide direct evidence of the offenses under investigation. Based on my training and experience, instant messages, voice messages, photos, and videos are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.  Messages sent directly to **Target Account 1** after the account has shared a post advertising Frank Graves' drug trafficking business may identify drug redistributors and customers, and information such as IP addresses used to access the account at relevant times may aid investigators in identifying the location of Frank Graves' redistributors, suppliers, and other co-conspirators.  Stored communications and files may also contain information relating to Frank Graves' sources of income (legitimate and illegitimate), methods and means of laundering drug proceeds, and purchases made with drug proceeds.

Affidavit of Task Force Officer Matt Blackburn - 19
USAO #2022R01268

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

54.     Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation.  For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

55.     Other information connected to the use of Instagram may lead to the discovery of additional evidence.  For example, associated and linked accounts, such as additional social media accounts, stored communications, photos, and videos may reveal services used to communicate with co-conspirators.  The identification of additional social media accounts may also reveal communication platforms used by Frank Graves to communicate with co-conspirators (*i.e.*, "dirty" accounts) that are not publicly associated with Frank Graves or viewable by investigators.  In addition, stored communications, contact lists, photos, and videos can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.  Searches conducted by Frank Graves using **Target Account 1** can also lead to the identification of co-conspirators or purchases made with drug proceeds.

56.     Therefore, Meta's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Instagram.  In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

57.     Pursuant to Title 18, United States Code, Section 2703(g), this application and affidavit for a search warrant seeks authorization to permit Meta, and its agents and employees, to assist agents in the execution of this warrant.  Once issued, the search warrant will be presented to Meta with direction that it identify the Instagram account described in Attachment A to this affidavit, as well as other subscriber and log records associated with the accounts, as set forth in Section I of Attachment B to this affidavit.

Affidavit of Task Force Officer Matt Blackburn - 20
USAO #2022R01268

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

58.     The search warrant will direct Meta to create an exact copy of the specified account and records.

59.     I, and/or other law enforcement personnel will thereafter review the copy of the electronically stored data, and identify from among that content those items that come within the items identified in Section II to Attachment B, for seizure.

60.     Analyzing the data contained in the forensic image may require special technical skills, equipment, and software.  It could also be very time-consuming. Searching by keywords, for example, can yield thousands of "hits," each of which must then be reviewed in context by the examiner to determine whether the data is within the scope of the warrant.  Merely finding a relevant "hit" does not end the review process. Keywords used originally need to be modified continuously, based on interim results. Certain file formats, moreover, do not lend themselves to keyword searches, as keywords, search text, and many common e-mail, database and spreadsheet applications do not store data as searchable text.  The data may be saved, instead, in proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases, as well.   Consistent with the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months.  All forensic analysis of the data will employ only those search protocols and methodologies reasonably designed to identify and seize the items identified in Section II of Attachment B to the warrant.

61.     Based on my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize a variety of e-mail communications, chat logs and documents, that identify any users of the subject account and e-mails sent or received in temporal proximity to incriminating e-mails that provide context to the incriminating communications.

Affidavit of Task Force Officer Matt Blackburn - 21
USAO #2022R01268

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

**CONCLUSION**

62.     Based on the forgoing, I request that the Court issue the proposed search warrant.  This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court "a district court of the United States . . . that - has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). Pursuant to 18 U.S.C. § 2703(g), the government will execute this warrant by serving the warrant on Meta.  Because the warrant will be served on Meta, who will then compile the requested records and data, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.  Accordingly, by this Affidavit and Warrant, I seek authority for the government to search all of the items specified in Section I, Attachment B (attached hereto and incorporated by reference herein) to the Warrant, and specifically to seize all of the data, documents and records that are identified in Section II to that same Attachment.


Matthew Blackburn, Affiant
Task Force Officer, FBI


The above-named agent provided a sworn statement to the truth of the foregoing affidavit by telephone on this 8th day of February, 2023.


BRIAN A. TSUCHIDA
United States Magistrate Judge

Affidavit of Task Force Officer Matt Blackburn - 22
USAO #2022R01268